# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNIVERSITY OF CHICAGO MEDICAL CENTER,<br><br>*Plaintiff*,<br><br>v.<br><br>XAVIER BECERRA, Secretary, U.S. Department of Health and Human Services,<br><br>*Defendant*. | Case No. 16-cv-1276 (DLF) |

## <u>MEMORANDUM OPINION</u>

In this Medicare case, the University of Chicago Medical Center seeks review of a 2015 decision by the Provider Reimbursement Review Board.  For the following reasons, the Court will deny the petition for review.

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

The federal Medicare statute funds health care for older Americans.  *See, e.g.*, *Fischer v. United States*, 529 U.S. 667, 671 (2000).  Under the statute, hospitals providing care can generally recoup their reasonable costs from the federal government.  *See* 42 U.S.C. § 1395g.  Whether a hospital's costs are reasonable depends in part on a complicated statutory formula, *see id.* § 1395ww(d)(5)(B), the details of which are not important here.

The Secretary of the Department of Health and Human Services has promulgated regulations that specify how hospitals may request reimbursement for their reasonable costs. Under those regulations and by statute, hospitals "submit cost reports to contractors . . . known as

fiscal intermediaries." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 150 (2013). If a hospital "is dissatisfied with the intermediary's reimbursement determination," it can appeal it to the Provider Reimbursement Review Board, a subcomponent of the Department. *Id.*; *see* 42 U.S.C. § 1395oo. Hospitals that disagree with the Board's decisions can seek judicial review "in the district court of the United States for the judicial district in which [they are] located . . . or in the District Court for the District of Columbia." 42 U.S.C. § 1395oo(f)(1).

The Board has "full power and authority to make rules and establish procedures . . . necessary or appropriate to carry out" its responsibilities. *Id.* § 1395oo(e). Circa 2005—the time period relevant to this case—the Board's rules and procedures required any "request for [a] Board hearing" (*i.e.*, any notice of appeal) to "identify the aspects of [a] determination with which" an appellant was "dissatisfied" and "explain why the [appellant] believe[d] the determination [was] incorrect in such particulars." 42 C.F.R. § 405.1841 (2005); Admin. Record ("AR") at 6, Dkt. 49. The Board's rules for appellants elaborated as follows:

> Your hearing request must contain an identification and statement of the issue(s) you are disputing. . . . You must clearly and specifically identify your position in regard to the issues in dispute. For instance, if you are appealing an aspect of the disproportionate share (DSH) adjustment factor or calculation, do not define the issue as "DSH." You must precisely identify the component of the DSH issue that is in dispute. For example: Were the Intermediary's adjustments to the number of available beds for disproportionate share (DSH) qualification purposes proper?

Provider Reimb. Rev. Bd. Instructions ("PRRB Instr.") Part I § B.II.a (2002). In addition, in 2008, the Board promulgated a rule limiting appellants' rights to add new issues to old appeals. As to appeals then pending before the Board—again, the subset of appeals relevant to this case—the rule required appellants to raise such issues to the Board on or before October 20, 2008. AR 6–7; 42 C.F.R. § 405.1835(c)(3) (2008); 73 Fed. Reg. 30190, 30236 (May 23, 2008).

### B.        Factual Background and Procedural History

This case involves a 2005 appeal to the Board.  In 2002, the University of Chicago Medical Center filed a Medicare reimbursement request with its fiscal intermediary.  Compl. ¶ 20, Dkt. 1. The record does not contain a copy of the Center's request, but the parties agree that it included reimbursement for over $2 million based on certain time the Center's medical residents spent conducting research tasks ("research time"); certain time they spent participating in lectures and other teaching activities ("didactic time"); certain time they spent on paid vacation ("vacation time"); certain time spent on clinical rotations ("clinical rotation time"); and certain additional items carried forward from the prior fiscal year ("carry-forward").  *Id.* ¶¶ 37, 42; AR 5–7, 15.  They also agree that its reimbursement calculations presumed that the Center operated 417 reimbursable adult and pediatric hospital beds.  *See* AR 261, 422.[1]

In 2004, the Center's fiscal intermediary issued a reimbursement determination.  AR 180. The determination denied the Center's reimbursement requests for research time, didactic time, vacation time, clinical rotation time, and carry-forward.  *See, e.g.*, AR 3.   Further, it calculated the Center's total allowable reimbursement starting from the assumption that it operated 417 reimbursable adult and pediatric beds.  AR 422; *see* AR 393.

In 2005, the Center appealed to the Board.  AR 243.  Its appeal papers read as follows:

> The   [Center]   is   dissatisfied   with   the   Intermediary's determination . . . as to the total number of [its] full-time equivalent (FTE) residents used for purposes of calculating [its] indirect medical education ("IME") payments.  The [Center] contends that the Intermediary's determination is contrary to 42 U.S.C. § 1395ww(d)(5)(B) because it fails to include time spent by residents performing research and training required as part of their approved residency programs.

---

[1] Each of these variables is an input into the Medicare reimbursement formula mentioned above. *See* 42 U.S.C. § 1395ww(d)(5)(B).  Again, the details of the formula are not important to this case.

AR 1079.  In 2006, it added another issue to its appeal:  "Improper inclusion of beds from the Clinical Research Center."  AR 1068.  The Center argued that—in fact—it operated eight fewer reimbursable hospital beds than was presupposed, entitling it to approximately $700,000 more in reimbursement under the applicable statutory formula.  AR 1068, 1072.

In 2012, the Center filed a position paper before the Board.  AR 355.  The position paper sought reimbursement for didactic time, vacation time, clinical rotation time, and carry-forward as well as research time.  *See* AR 356.  In response, the fiscal intermediary objected that the Center forfeited the issues besides research time by failing to raise them with the Board before October 20, 2008.  AR 357.  It also objected that the Center forfeited its reimbursable-beds issue by failing to raise it in its initial reimbursement request to the fiscal intermediary.  *See* AR 394.

The Board disposed of the Center's claims in three decisions: one dated May 14, 2014; another dated July 16, 2015; and another dated February 4, 2016.  AR 1–16, 89.[2]  As to the Center's resident-time claims, the Board sided with the Center in part and its fiscal intermediary in part.  Initially, it found that the Center "did not properly and timely appeal [its] didactic and vacation time" claims, its clinical rotations claim, and its carry-forward claims.  AR 6.  It explained that the Center "first specifically addressed" those claims "when it filed its preliminary position paper" in 2012, after its "October 20, 2008 deadline."  AR 7.  As a result, the Board deemed those claims forfeited and dismissed them.  *Id.*; *accord* AR 15–16.  "Upon further review," however, the Board found that the Center "did include 'training time' in its initial appeal" and reinstated the Center's didactic time claims accordingly.  AR 89.

---

[2] In a letter dated April 27, 2016 closing the Center's appeal, the Board indicated that it had decided some of the Center's claims on "February 6, 2016."  AR 1.  But the decision in question is stamped "February 4, 2016," not February 6.  AR 14.  The discrepancy does not make a substantive difference.

As to the Center's beds claim, the Board sided with the Center's fiscal intermediary. The Board started by observing that circuit courts have split on whether, and under what circumstances, hospitals may appeal claims to the Board without first presenting them to a fiscal intermediary.  AR 7–12 (comparing *Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala*, 165 F.3d 1162 (7th Cir. 1999), to *Loma Linda Univ. Med. Ctr. v. Leavitt*, 492 F.3d 1065 (9th Cir. 2007), and *MaineGeneral Med. Ctr. v. Shalala*, 205 F.3d 493 (1st Cir. 2000)).  It then opted to follow the Seventh Circuit's position on the issue for purposes of this case, explaining the Center resided in Chicago and that—in the event of a conflict among circuits—the Board "generally has applied as controlling precedent the law of the Circuit in which [an appellant] is located."  AR 12 & n.39. Consistent with the Board's understanding of the law in the Seventh Circuit, the Board went on to dismiss the Center's beds claim as forfeited because the Center had not first raised it with its fiscal intermediary and because raising the beds claim with the Center's fiscal intermediary prior to appeal "would not have been clearly futile."  AR 7; *see also* AR 7–12 (discussing *Mary Hosp.*, 165 F.3d at 1165).

 "Even if the Seventh Circuit decisions were not controlling precedent," the Board added, it "would reach the same result."  AR 12.  At minimum, the Board explained, it had *discretion* to deem claims forfeited when a health care provider did not present them to its fiscal intermediary first.  *Id.* (citing cases).  And the Board had "consistently declined to exercise [its] discretion . . . to hear appeals" in such cases, at least "when reimbursement . . . was not precluded by a specific law, regulation, CMS Ruling or manual instruction" such that presentation to the intermediary would have been futile.  *Id.*

The Center petitioned for review.  Dkt. 1; *see* 42 U.S.C. § 1395oo(f)(1).

## II.      LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, the Court may grant summary judgment when "there is no genuine dispute as to any material fact and [a party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In challenges to agency action under the Administrative Procedure Act ("APA"), "[t]he entire case on review is a question of law."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  The Court "sits as an appellate tribunal," *id.* at 1225, and asks whether the agency's decision was (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" (2) "in excess of statutory jurisdiction, authority, or limitation[]," or (3) "without observance of procedure required by law," 5 U.S.C. § 706(2).

Challenges to the Board's decisions proceed under the APA.  42 U.S.C. § 1395oo(f)(1).  "Accordingly," the Court may "set aside the Board's decision only if it is 'arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law,' or unsupported by substantial record evidence."  *HCA Health Servs. of Okla., Inc. v. Shalala*, 27 F.3d 614, 616 (D.C. Cir. 1994) (quoting 5 U.S.C. § 706(2)).

The Court defers to the Board's reasonable reading of its own regulations, *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019), and to its discretionary decisions so long as they are reasonable and reasonably explained, *see Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57 (1983).  Although the Court "may not supply a reasoned basis for the [Board's] action that the [Board] itself has not given," it must "uphold a decision of less than ideal clarity if the [Board's] path may reasonably be discerned."  *State Farm*, 463 U.S. at 43 (first quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and then quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Syst.*, 419 U.S. 281, 286 (1974)).

6

## III.   DISCUSSION

The Board dismissed the Center's vacation time, clinical-rotations time, and carry-forward claims because—in its view—the Center forfeited them by failing to raise them with the Board before October 20, 2008.  AR 6.  It also dismissed the Center's bed-count claim (which dealt with the eight beds the Center alleged were not reimbursable) because the Center had not raised it with its fiscal intermediary before presenting it to the Board.  AR 7–12.  Neither dismissal was arbitrary, capricious, an abuse of discretion, or contrary to law.  Accordingly, the Court will affirm both decisions and enter summary judgment against the Center.

### A.    Forfeiture of Certain Resident Time Claims

The Board's rules, like most appellate tribunals' rules, provide that appellants must raise their arguments early or forfeit them.  *Cf. IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871, 876 (D.C. Cir. 2020) (applying similar rule on appeal to the D.C. Circuit).  In 2005, when the Center first took its appeal, Board regulations required "request[s] for . . . Board hearing[s]" to "identify the aspects of [a] determination with which" an appellant was "dissatisfied" and to "explain why the [appellant] believe[d] the determination" was "incorrect in such particulars."  42 C.F.R. § 405.1841 (2005).  Courts review the Board's forfeiture findings for reasonableness.  *See, e.g.*, *Evangelical Cmty. Hosp. v. Becerra*, No. 21-cv-1368, 2022 WL 4598546, at *5–6 (D.D.C. Sept. 30, 2022); *cf. Kisor*, 139 S. Ct. at 2414.

The Board acted reasonably in finding that the Center forfeited its vacation time, clinical-rotations time, and carry-forward claims by failing to identify them "in [their] particulars" before October 20, 2008.  42 C.F.R. § 405.1841 (2005).  The Center's initial appeal materials complained that its fiscal intermediary had not reimbursed it for "time spent by residents performing research and training required as part of their approved residency programs."  AR 60.  Nowhere did they

mention vacations, clinical rotations, or carry-forward time.  As a result, they gave the Board (and the Center's fiscal intermediary) essentially no notice that the Center planned to put those items at issue in its appeal—the very kind of "sandbagging" that forfeiture rules seek to prevent.  *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1031 (D.C. Cir. 2020).  It follows that the Center forfeited each of those items, or at least that the Board could reasonably have thought so.  *Cf. Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 775 (D.C. Cir. 2022) (affording "considerable deference" to the Board's decisions (quoting *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994))).

An example from the Board's 2005 rules confirms this conclusion.  In 2005, the Board's rules warned appellants to "clearly and specifically identify [their] position[s] in regard to the issues" they sought to appeal.  PRRB Instr. Part I § B.II.a; AR 6.  The rules then offered an example relating to Medicare's "disproportionate share hospital (DSH)" adjustment, which offers "enhanced Medicare payments" to hospitals "serving an 'unusually high percentage of low-income patients.'" *Becerra v. Empire Health Found.*, 597 U.S. 424, 429 (2022) (quoting *Auburn Regional Med. Ctr.*, 568 U.S. at 150) (cleaned up).  Per the example, if a hospital "appeal[ed] an aspect of [its] disproportionate share . . . calculation," it could not "define the issue as 'DSH.'"  PRRB Instr. Part I § B.II.a.  Instead, it needed to challenge the precise item under review, for instance its intermediary's "adjustments to the number of available beds for disproportionate share (DSH) qualification purposes."  *Id.*  Just so here, indeed more so here.  If the Center sought review of its fiscal intermediary's vacation, clinical-rotation, and carry-forward determinations, it was obliged to mention those items "clearly and specifically."  *Id.*  Instead, it entirely omitted them.

An example from the Eastern District of New York confirms it too.  In *Lutheran Medical Center v. Burwell*, a hospital filed an appeal alleging that its fiscal intermediary "incorrectly

calculated [its] number of intern and resident full-time equivalents for graduate medical education purposes."  No. 14-cv-731, 2016 WL 3882896, *2 (E.D.N.Y. Jul. 13, 2016).  Later, the hospital clarified that its appeal included intern and resident count-related issues carried forward from prior fiscal years.  *Id.*  The Board found that the hospital forfeited the carry-forward issues by failing to raise them in its initial appeal papers—even though those papers did mention intern and resident-count issues in general terms—and the District Court for the Eastern District of New York affirmed.  *Id.* at *4.  Likewise in this case.  By referring generally to "time spent by residents performing research and training," AR 60, the Center's appeal papers did not alert the Board to its additional vacation time, clinical rotation time, and carry-forward arguments.[3]

The Center's counterarguments fail.  At the outset, it is not true that the Board "did not rely on any statute or notice-and-comment regulation" in deeming the Center's claims forfeited.  Pl.'s Mem. in Supp. of Summ. J. at 27, Dkt. 41-1.  The Board relied on 42 C.F.R. § 405.1841 (2005), a notice-and-comment regulation which codified its forfeiture rules.  AR 6.

The Center adds that neither 42 C.F.R. § 405.1841 nor the Board's own rules specifically required vacation time, clinical-rotations time, and carry-forward claims "to be appealed as separate 'issues'" in 2005, when the Center took its appeal.  Pl.'s Mem. in Supp. of Summ. J. at 28.  But that is irrelevant.  As a general matter, both the regulation and the Board's rules required appellants to identify their claims "clearly and specifically."  PRRB Instr. Part I § B.II.a (2002).  That language is clear and unequivocal.  *Cf. United States v. Swift & Co.*, 158 F. Supp. 551, 555 (D.D.C. 1958) ("It is a fundamental rule of statutory interpretation that a statute general in its

---

[3] Unlike the hospital in *Lutheran Medical*, the Center mentioned its carry-forward issues in its initial briefing before the Board.  *Compare* 2016 WL 3882896, at *2–3, *with* AR 357.  But that distinction does not make a difference under the Board's rules and regulations, which say that a hospital must raise every issue for appeal in an initial hearing request to the Board.  PRRB Instr. Part I § B.II.a (2002); 42 C.F.R. § 405.1841 (2005).

language is to be given general application." (quoting *United States v. Nat'l City Lines*, 80 F. Supp. 734, 741 (S.D. Cal. 1948))).   And in this case, the Board reasonably determined that the Center's attempt to appeal its vacation time, clinical-rotations time, and carry-forward claims fell short of what its rules required.   Further, although the Board could have written its rules more explicitly, it did not need to do so.   Administrative agencies are free to set general standards by regulation and then flesh those standards out in case-by-case adjudication.   *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290–94 (1974).

For similar reasons, this is not a case in which "the regulated party . . . was not on notice of [the] agency's" legal position before it appeared for a hearing.   *Univ. of Tex. M.D. Anderson Cancer Ctr. v. Sebelius*, 650 F.3d 685, 688 (D.C. Cir. 2011) (cleaned up).   In *M.D. Anderson*, the Board "sprung" a *new* "requirement" on a hospital after a hearing concluded.   *Id.   But see Bell Aerospace*, 416 U.S. at 294 ("[T]he Board is not precluded from announcing new principles in an adjudicative proceeding.").   Here, by contrast, the Board at most applied an old standard to new facts—a routine facet of agency adjudication.   Doing so did not "deprive[]" the Center "of fair notice" as to its obligations.   *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1088 (D.C. Cir. 2007).

The reality that the Board applied an old rule to the Center also defeats the Center's reliance on 42 U.S.C. § 1395hh(a)(1) and *FCC v. Fox Televisions Stations Inc.*, 556 U.S. 502 (2009). Section 1395hh(c)(1) says that the Department of Health and Human Services must publish all its "manual instructions, interpretative rules, statements of policy, and guidelines of general applicability" regarding Medicare payments in the Federal Register.   42 U.S.C. § 1395hh(c)(1). Here, however, the Board's decision was an application of an old rule rather than a new "manual instruction[], interpretative rule[], statement[] of policy, [or] guideline[] of general applicability."

10

*Id.*  Similarly, although *Fox* holds that an agency may not change its prior policies in an adjudication without explaining itself, the Center has not identified any change in policy meriting explanation.  At most, the Board applied an old policy to facts it had not previously considered.  *Cf. Bell Aerospace*, 416 U.S. at 294–95.

Nor does it help the Center that, in 2008, the Board promulgated new rules describing "resident count" as a "common example[]" of an "issue" that healthcare providers might appeal.  Provider Reimb. Rev. Bd. Rules 8.1 (2008).  For one thing, those same rules make clear that "each contested component" of a fiscal intermediary's reimbursement determination must be "appealed as a separate issue and described *as narrowly as possible*," a framing that favors the Board.  *Id.* (emphasis added).  For another, in this case, the Center did not just appeal its fiscal intermediary's "resident count" full stop.  Rather, it specifically appealed its fiscal intermediary's handling of resident research and training time.  AR 60.  The natural inference was that the Center's appeal did not cover other resident-related issues. *Cf. O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86–87 (1994) (discussing the maxim that "*[i]nclusio unius, exclusio alterius*").

The Center also says that it raised issues related to its carry-forward claims in *other* appeals before the Board.   But the Board's forfeiture rules do not contain an exception for claims raised in other appeals, and for good reason.  Each appeal before the Board is a separate proceeding in which hospitals may pursue separate legal theories.  Likewise, it does not matter that the Board reached conclusions in the Center's other appeals that have obvious implications for this appeal.  Under the Board's rules, a hospital's reimbursement amounts do not "automatically adjust" to accommodate the results of prior appeals. *Lutheran Med. Ctr.*, 2016 WL 3882896, at *4.  Instead, to preserve a claim with respect to a particular appeal, a hospital must identify that claim in its initial appeal papers requesting a hearing *for that appeal*.  *See* 42 C.F.R. § 405.1841(a)(1) (2005).

11

By analogy, to preserve an issue for appeal in the D.C. Circuit, a litigant must raise the issue in the district court proceedings from which she plans to appeal. *See, e.g.*, *Murthy v. Vilsack*, 609 F.3d 460, 465 (D.C. Cir. 2010). It is not enough to raise the issue in a *different* district court case, even if the cases are closely related.

Finally, the Center argues that the Board could have deduced the true scope of its appeal from the first sentence of its appeal notification—which expressed the Center's "dissatis[faction]" with its fiscal intermediary's "determination . . . as to the total number of [its] full-time equivalent (FTE) residents," AR 60—and from the Center's estimate that its appeal put more than $2 million in Medicare payments in controversy. Not so. As to the first point, the Center's appellate materials did not end with their first sentence. They went on to specify the nature of the Center's "dissatis[faction]": namely, "that the Intermediary's determination [was] contrary to 42 U.S.C. § 1395ww(d)(5)(A) because it fail[ed] to include time spent by residents performing research and training." *Id.* As explained, that language implicitly excluded other grounds for appeal. And as to the second point, the possibility that the Board might have been able to deduce the true scope of the Center's appeal from its estimate of the amount in controversy hardly shows that the Center "clearly and specifically" put vacation time, clinical-rotation time, and carry-forward claims at issue in its appeal.[4] PRRB Instr. Part I § B.II.a (2002). Certainly, it was not arbitrary for the Board to take such a position.

---

[4] The Center's complaint that the Board "ignored [a] declaration from Ms. Margarita Saucedo" discussing the nature of the Center's $2 million estimate does not change this conclusion. Pl.'s Opp. to Def.'s Mot. to Dismiss at 19, Dkt. 47; *see* Pl.'s Mem. in Support of Summ. J. at 32–34. Even if Ms. Saucedo were correct that the Center's $2 million figure incorporated items besides research and training time, it would not follow that the figure gave the Board adequate notice of the issues the Center had raised in its appeal.

Likewise, although the Board did not specifically reference Ms. Saucedo's declaration in its decisional materials, it did not need to. Although the Court "may not supply a reasoned basis for

For all these reasons, the Board acted reasonably in dismissing the Center's vacation time, clinical-rotation time, and carry-forward claims as forfeited.

### B.      Failure to Present Eight-Bed Claim to Fiscal Intermediary

Independently, the Center challenges the Board's dismissal of its bed-count claim. The Board dismissed that claim (1) because it lacked authority to hear it under Seventh Circuit precedent and (2) because, as a discretionary matter, it would have declined to hear it even if it had authority to do so.  AR 248–52.  The Court will affirm the Board's decision on the second basis.  Assuming without deciding that the Board had discretion to hear the Center's bed-count claim, it did not act arbitrarily or unlawfully in declining to hear it.

Section 1395oo of the Medicare Act describes the circumstances in which a hospital may appeal a reimbursement decision to the Board.  *See Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 403 (1988).  In relevant part, it says that a hospital "may obtain a hearing before the Board" if it "is dissatisfied with a final determination of . . . its fiscal intermediary . . . as to the amount of total program reimbursement due" to it.  *Id.* (quoting 42 U.S.C. § 1395oo(a)).  The Board has "the power to affirm, modify, or reverse a final determination of [a] fiscal intermediary with respect to a cost report"—*e.g.*, a request for reimbursement—"and to make any other revisions on matters covered by such cost report . . . even though such matters were not considered by the intermediary in making such final determination."  42 U.S.C. § 1395oo(d).

_____

the [Board's] action that the [Board] itself has not given," it must "uphold a decision of less than ideal clarity if the [Board's] path may reasonably be discerned."  *State Farm*, 463 U.S. at 43 (cleaned up).  And in context, the Board clearly accepted the Center's fiscal intermediary's position that Saucedo's declaration "[did] not even begin to meet the legal threshold to properly articulate an appealable issue before the [B]oard."  AR 39; *see* AR 36 (acknowledging the Center's argument that "the calculation included in its initial appeal . . . 'self-evidently and indisputably reflected'" the Center's carryover arguments—the argument presented in Ms. Saucedo's declaration—but concluding that those issues were nonetheless "not specifically raised" by the Center's appeal materials).

The Courts of Appeals have split on what "dissatisfied" means—in particular, on whether a hospital can be "dissatisfied" with an intermediary's refusal to reimburse specific costs if the hospital (1) did not request reimbursement for those costs from the intermediary and (2) such a request would not have been futile under the applicable Medicare rules.  AR 7–12 (citing cases); *see also Bethesda*, 485 U.S. at 405 (holding that a hospital is "dissatisfied" when it did not request reimbursement for costs because its request would have been futile).  But it is generally accepted that, under § 1395oo(d), the Board does not *need* to consider requests for reimbursement that a hospital has not lodged with its fiscal intermediary.  Rather, § 1395oo(d) grants the Board "the power"—but not the obligation—to "make . . . revisions on matters covered" by a reimbursement request "even though such matters were not considered by the intermediary."  42 U.S.C. § 1395oo(d); *see, e.g.*, *UMDNJ-Univ. Hosp. v. Leavitt*, 539 F. Supp. 2d 70, 79 (D.D.C. 2008) ("Congress empowered the Board to make such modifications and . . . to consider evidence not put before [a] fiscal intermediary, but did not require it to do so.").

When exercising its authority under § 1395oo(d), the Board has "consistently declined" to hear claims that a hospital did not present to its fiscal intermediary unless presenting the claim to the intermediary would have been futile.  AR 12; *see, e.g.*, *Affinity Med. Ctr. v. BlueCross BlueShield Ass'n*, PRRB Dec. No. 2010-D15 (Mar. 11, 2010) (applying the policy in similar circumstances).  By preventing hospitals from lodging claims for reimbursement directly with the Board, this "policy of presentment" aims to "prevent . . . end-run[s]" around fiscal intermediaries.  AR 9.  As other courts in this district have explained, if the Board regularly considered issues that hospitals did not raise before their fiscal intermediaries, it could "make the PRRB [a] tribunal of original jurisdiction, eliminate a tier of review, and potentially slow the reimbursement process for other providers."  *UMDNJ*, 539 F. Supp. 2d at 79.

14

Against this backdrop, the Board acted reasonably in declining to consider the Center's bed-count claim—*i.e.*, its claim that its fiscal intermediary should have proceeded from the premise that the Center operated 409 rather than 417 reimbursable adult and pediatric hospital beds.  The Center did not raise the same bed-count complaint with its fiscal intermediary that it filed with the Board.  *See* AR 422 (reporting 417 beds).  "Only in hindsight did" the Center "determine that it could (and should) have reported the[] [relevant] items differently, thereby potentially increasing [its] reimbursement."   AR 12.   But the Center's "negligence in understanding the Medicare regulations" and "uncertainty as to the interpretation of a regulation" do not excuse its failure to raise the issue before the fiscal intermediary.  *Id.*  Nor does it mean raising the issue before the fiscal intermediary would have been futile.  The Board thus had good reasons not to consider the Center's bed-count contentions on their merits.

The Center responds that it *did* raise its bed-count claim with its fiscal intermediary—in the language of the statute, that its bed-count claim counts as a "matter[] . . . considered by the intermediary," *see* 42 U.S.C. § 1395oo(d)—because it (incorrectly) told its fiscal intermediary that it operated with 417 reimbursable beds.  Not so.  A "matter" consists of the "facts forming the basis of [a] claim" or the "facts material to [an] issue."  "Matter," *Black's Law Dictionary* 978 (6th ed. 1990).  And by telling its fiscal intermediary that it operated with 417 reimbursable beds as opposed to 409 beds, the Center did not present any facts to the Board "forming the basis of its claim" that it operated with fewer than 417 beds.  *Id.*  In other words, although the Center made reference to its bed count in the cost calculations it presented to its fiscal intermediary, the question of whether the Center operated with fewer than 417 reimbursable beds was not a "matter[] . . . considered by the intermediary in making [a] final determination" on the Center's reimbursement amount.  42 U.S.C. § 1395oo(d).  By analogy, suppose the Center deducted $10

million in salary expense on its federal income tax return.  *See* 26 U.S.C. § 162(a)(1).  The Center could not claim that its return *really* sought $12 million in salary expense deduction, even if (in one sense) the return put the Center's actual salary expenses at issue.

Nor was Board's decision not to hear the Center's unpresented bed-count claim inconsistent with its prior decision in *Mayo Regional Hospital v. Blue Cross & Blue Shield Association*.  PRRB Hearing Dec. 2002-D15 (Mar. 27, 2002).  Although an agency must "treat like cases alike," *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007), it need not "grapple with every last one of its precedents, no matter how distinguishable," *Jicarilla Apache Nation v. U.S. Dep't of Int.*, 613 F.3d 1112, 1120 (D.C. Cir. 2010).  And here, the distinction between the Center's case and *Mayo Regional* is "so plain that no inconsistency appears." *Bush-Quayle '92 Primary Comm., Inc. v. FEC*, 104 F.3d 448, 454 (D.C. Cir. 1997).  In *Mayo Regional*, a hospital claimed certain costs for uncollectible Medicare debts ("bad debt") on its cost report. PRRB Hearing Dec. 2002-D15 at 17.  It also claimed additional ("crossover") bad debts as "contractual allowances" on separate components of its cost report, Schedule G and Worksheet G. *Id.*  The Board elected to consider the additional bad debts, reasoning that the hospital's decision to list the bad debts as contractual allowances was acceptable "from an accounting standpoint" and that "a contractual allowance loss could lead to cross-subsidization of payors." *Id.*  Here, by contrast, the Center did not make a similar accounting choice and similar cross-subsidization worries are not present.  That makes *Mayo Regional* plainly inapposite.

Likewise, the Board's decision to decline to hear the Center's bed-count claim did not rest on "inapplicable policy considerations."  Pl.'s Supp. Mem. at 8, Dkt. 50.  As the cases the Board cited in its decision explain, the Board has good reasons to exercise its power to "consider matters not specifically raised before [an] intermediary . . . only sparingly."  *St. Luke's Hosp. v. Sec'y of*

*Health & Hum. Servs.*, 810 F.2d 325, 327 (1st Cir. 1987); *see* AR 10–11 (citing *St. Luke's*).  For example, if the Board regularly passed upon questions not presented to a fiscal intermediary first, it would encourage hospitals to submit sloppy cost reports to their fiscal intermediaries—effectively "eliminat[ing] a tier of review" and "slow[ing] the reimbursement process for other providers."  *UMDNJ*, 539 F. Supp. 2d at 79; *see* AR 11 (citing *UMDNJ*).  Further, and in any event, the Board's decision to apply its presentment policy in prior cases gave it reasons to apply that policy in this case for consistency's sake.

Finally, the Board's decision did not fall afoul of 42 U.S.C. § 1395hh(a)(2).  Under § 1395hh(a)(2), the Board may not adopt a "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals . . . to furnish or receive services" under the Medicare statute without notice-and-comment regulation.  42 U.S.C. § 1395hh(a)(2); *see Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1809 (2019).  Because the Board did not adopt its presentment policy through notice-and-comment rulemaking, it follows that the Board cannot rely on that policy to the extent that it counts as a "(1) rule, requirement, or other statement of policy that (2) establishes or changes (3) a substantive legal standard" governing (4) the items listed above. *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. at 1809.  Here, however, the Board's presentment policy does not establish or change a substantive legal standard.  At most, it establishes a *procedural* standard—a standard explaining how the Board will exercise its discretion in handling claims that a hospital failed to present before its fiscal intermediary.  Rules about the consequences of waiver and forfeiture are paradigmatically procedural.  *See, e.g.*, *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (describing rules of waiver and forfeiture as "ordinary procedural rule[s]").

For all these reasons, the Board acted reasonably in declining to adjudicate the Center's bed-count claims on their merits.

## CONCLUSION

Accordingly, the Court denies the Center's motion for summary judgment, grants the Board's motion for summary judgment, affirms the Board's decision, and denies the Center's petition for review.  A separate order accompanies this memorandum opinion.

June 26, 2024

DABNEY L. FRIEDRICH
United States District Judge

18